We'll call our first case for the morning and that is Myron Ward vs. Lamanna et al. Thank you, Your Honor. And may it please the Court, I'm Jeffrey Davidson representing the appellants in this matter. There's no dispute on this- Are you reserving time? Oh, I apologize. I have three minutes for rebuttal. Thank you. Your Honor, there's no dispute on this record that the composition of the dust in the Unicor facility was a dangerous composition, that it consisted of 20% silica dust, 30% synthetic vitreous fiber- If it was so dangerous, why didn't OSHA say it was dangerous? Your Honor, OSHA did say in its initial report that the inmates were potentially exposed to dangerous substances and had a series of recommendations- But they came through, I mean, first time they didn't necessarily- when did they come through the first time, in 01? How soon after the complaint was made to them? In 2001, it was a few months after the complaint was made. They didn't- But in 03, it was the next day, was it not? I don't believe it was the next day after the complaint was made. I thought it was very rapidly, one of those things you couldn't overnight change things around. Well, I believe there's a memorandum in the record from Stephen Hausler, one of the defendants, saying that OSHA would be coming in within the next couple of days. And if I recall correctly, that memorandum did give at least two days' notice that OSHA was going to come in. Now, OSHA didn't regulate this substance, did it? OSHA didn't have a particular standard for the amount of substance that was safe, that's correct. Now, the district court- was the district court correct in her assessment of the danger posed by this toxin, do you think? I don't recall that the district judge made a particular scientific assessment of the danger of the substance. I don't think there's any dispute on this record, though, Your Honor, that these substances are dangerous in sufficient quantity. And the only question, really, on this record is what that quantity was, and did it cause the injuries that my clients have suffered? Well, isn't that indeed one of the problems with your case? What evidence at all do you have that they were exposed at a level that would constitute a danger? Well, I might preface this, Judge Jordan, by saying that we didn't move for summary judgment. The defendants moved for summary judgment, and there was sufficient evidence on the record to create a triable issue of fact. And I would point you to the deposition testimony that inmates routinely emerged from the UNICOR facility covered in white dust, looking like a snowman. The testimony and evidence on the record that the ventilation system was frequently broken and that when it did, it… Except it's true that they came out as snowmen. Isn't it incumbent upon the defendants to have produced some kind of evidence about what it was that was covering them? I mean, it seems that you're asking us to make, and you asked the district court to make, an inference on top of an inference, which is that assume that everything we're saying is true, that people came out dust covered, and okay, we do that in a summary judgment setting. And now assume what the content of that dust was, and how are we supposed to do that? Why are we to assume that this is the bad stuff, and the bad stuff in sufficient quantities to be dangerous, as opposed to something else? If I may, I might correct you on one point, which is that there is clear evidence on the record of the composition of this dust. If you look at Joint Appendix page 1896, our expert gave the results of the bulk dust sampling that OSHA did, and it came out that, in fact, the dangerous components of my core board were in that dust. So you're telling us that whatever your expert did on that day, we have to assume that that's what your clients were covered in each day they say they were covered? I think that's a reasonable inference on summary judgment, that the dust that was created was dangerous, and there's no evidence in the record of any other kind of dust that could explain the fact that they were covered. Did anyone request a respirator and was turned down or rebuffed in that request? Yes, that's correct, Your Honor. I believe there's testimony from both my client, Myron Ward, that he asked on multiple occasions for a respirator, and certainly one of the plaintiffs below who did not appeal, Kevin Sigars, testified very clearly that he asked for a respirator and was rebuffed, and in fact was rebuffed in the most callous manner by Defendant Lamana. None of the guards had respirators, did they? They did not have respirators. However, Your Honor, the evidence in the record is that none of those folks were on the floor of Unicor eight hours a day, five days a week, the same as my clients. What is the danger here? Cancer and silicosis? That is one of the dangers. That's the long-term danger. How long was the plant there before it became something else in 2006? My clients were there starting in, I believe, 2002. But how long had that particular operation been going on? I don't know, Your Honor. Because it would seem if it went back several years, did anyone contract silicosis or lung cancer? It's not on the record here, Your Honor. You may be familiar with the general working of asbestos, for instance, and it has a long latency period so that you can be exposed and then 20 years down the line is the first time you'll develop those kinds of symptoms. But here, Your Honor, the record is that my clients are sick, that they currently have respiratory ailments, that they have a wide variety of symptoms, and the bona fides of that have not been challenged by the government on this appeal. I thought that the one difficulty was that the district court asked whether you had any evidence and the court was no. Have I got the record wrong in that regard? If that was said in the district court, that's not what the record reflects. The record reflects that ample medical evidence was provided. And in fact, even the defendant's own medical expert, the results of the pulmonary testing of my client showed great deficiencies in pulmonary capacity. The only thing to rebut that is the opinion of their expert that those tests were somehow invalid. But in turn, that's contradicted by the text of the tests themselves, which says that effort was good, that they were cooperative. Could your clients have said, I'm just not going to work here anymore, put me somewhere else? If they had been aware of the risk, and if they had applied that to their specific Well, wait a minute. If they'd been aware of the risk. They are getting sick. You're saying they're sick. They are covered in dust. It doesn't take much to say two plus two, I want to get out of here. Let's assume for the sake of argument that they didn't like the conditions, whatever they were. Could they not have said, I don't want to work in this workplace, put me somewhere else? Could they not have done that? Number one. Number two, did anyone do that? The short answer is yes, Your Honor. They could have requested that. In this case, it didn't really come up because all of my clients were transferred out of the facility for unrelated reasons toward the end of their tenure. Well, how long were tenure? What was the longest of the tenures? I think the longest was somewhat over two years. I believe that was Mr. Hill. Two years, 18 months, and nine months or something like that. I think that's right. I think that's right. If this goes to the assumption of the risk question, as we said in our briefs, I think No, I don't think it's assumption of the risk. It's more the concept, the farmer first prong of being incarcerated under intolerable conditions, under cruel and unusual punishment, the first prong of farmer. If you are incarcerated under those conditions, i.e., it's out of your control and you're being subjected to it, then the voluntariness of your being there is an issue. I don't think it's really assumption of the risk. I think, Your Honor, that case law that we cited in the restatement casts some light on what is meant by voluntary. They didn't voluntarily assume the risk of being injured. In fact, the testimony is they didn't know anything of the dangers of what they were being exposed to until 2003 when OSHA came in. So they were involuntarily exposed in that they had no idea that this was happening. There's evidence that the microboard had labels on it. This is hazardous. Use respirators or whatever. Isn't it there, like right there, if they wanted to do something about it, they could? Well, there's no evidence that they had read those labels at any time when it would have prevented their exposure. And the bottom line from the jurisprudence seems to come from the DeShaney case, that the defendants controlled the conditions of confinement categorically. And if they've got knowledge, that they don't share with the defendants. But that's not an Eighth Amendment case. That's totally different. I mean, what you've got here, we've been talking so far about the objective prong. But what about the subjective? You have to show that there was a deliberate indifference or a state of mind that goes far beyond negligence. And how are you going to show that here? Well, Your Honor, the evidence is solid. The defendants actually knew what was going on and disregarded it and did so with intention and they didn't care what happened to anyone in this particular plant. Sure, Your Honor. The evidence shows that as early as 2001, there were complaints about the dust. The defendants were there. They saw what was going on. They knew that the inmates were using air hoses to blow dust into the air. They knew that was a dangerous practice. That's all in the record. And also in the record is that what you're using, usually use an air hose is to clean off your machine and clean off your clothes before you leave. Correct. And also that they use it to blow and sweep dust and clean up. So yes, put dust into the air. Are you still asking us then to make assumptions about the content of that dust? I mean, you seem to take that as a baseline that people knew what the content of the dust was and knew that it was at a dangerous level and were deliberately indifferent to it. What evidence do you have of those things? These people aren't scientists. They're not going to know exactly the quantity of the dust and the medical danger. But they do know that the dust is there. There was testimony that they had seen the- Is that enough though? I mean, if you say the dust was there, isn't it significant to know what the dust was? If prison officials on the basis of complaints have OSHA in and OSHA says, you have some problems, but it's not the content of the dust. And that information is given to them once by an independent contractor, once by OSHA itself. How do you get to deliberate indifference under the Helling versus McKinney standard, which I think you agree applies, right? Yes. Your Honor, if the OSHA tests are bona fide, then I think indeed the defendants could rely on those. The evidence in the record though was that those tests were deliberately sabotaged, that the work practices at the time were altered so as to lead to a lower quantity of dust being reflected. And if you look at the production records in the factory for the 2003 test that took place, you'll see that on the months where the testing was performed, it was actually at a dip in production. And at times during my client's tenure at the Unicor facility, there was as much as eight times as much production as on the day of the OSHA test. Moreover, the question here is summary judgment. I'm not saying that we have all the evidence on the record or that it's indisputable in our favor, only that we can go to a jury and tell them something about what was in the factory, what it caused happening to my clients, and what the defendant's mental state was with respect to that. But what evidence do you have that even gets you past summary judgment with respect to intentional disregard of a known risk? We have knowledge of what the risk was from the 2001 testing. We've got inmates expressing concerns to the defendants. If you're a prison official, all you know is that, yes, there are complaints, but that there's been testing, not once, but twice. And one of the tests said that even if the facility was operating at 100% capacity, the air quality would still be within norms. That assumes that the defendants didn't do anything to manipulate the test results. Well, OSHA would... How would they, if they came in in 03 very shortly afterwards, and I think it was a day or so, how do you manipulate those test results? We have specific evidence in the record that they told the prisoners to cease some of the practices that led to dust being in the air, such as using the air hose to blow off the saw blade as it was on. But they also, did the OSHA person say that there were other ways to do testing? There were ways to see if they were playing around with this, and that those default tests did not show that there was a problem? I know the defendant's expert said that, but that's a mere opinion, and I might point out again that that expert report is unsworn, so that a reasonable jury could choose to disbelieve that expert report on that basis. So back to Judge Jordan's question, what do you have that shows that there was objectively a problem and subjectively intentional actions on behalf of the prison officials? Your Honor, on the objective side, every possible piece of evidence that could be provided that was dangerous, short of objective testing, was provided. And of course, defendants say you didn't find any objective testing, you didn't conduct your own air quality tests. Well, the reason for that is that defendants allowed all of the relevant evidence of the objective workings of the factory to be destroyed during the pendency of this litigation, and that goes to our spoliation. But the spoliation issue, that was three years later, and you have to show that it was intentional. I mean, I know you say not to show it was intentional, but we have a case Brewer, which makes it clear that they had to have done something intentionally. If a decision is made by the folks in Washington with respect to the Bureau of Prisons, how does that show that they intentionally desired to spoil evidence in existence with regard to this particular facility? Your Honor, my reading of Brewer is that it actually doesn't require intentionality with respect to the least serious of the sanctions, which is simply the inference that the evidence, if it still existed, would be helpful to my clients. Furthermore, the question is... Well, what we said in Brewer is, quote, such a presumption or inference arises, however, only when the spoliation or destruction of evidence was intentional and indicates fraud and desire to suppress the truth, and does not arise where the destruction was a matter of routine with no fraudulent intent. Pretty clear. Your Honor, that was with respect in Brewer to a request for something much more serious, a jury instruction, which is not what we're asking here for. We're asking for a little help in getting past... But the jury instruction tells you what the state of the law is. It does say what the state of the law is. I would point the Court, and I apologize for going over my time, to several recent cases, and particularly the Silvestri case out of the Fourth Circuit, which dealt with a very similar factual circumstance. And they said, there's a duty to preserve evidence, and if you fall short in that duty, there's going to be some sanction against you. And it's only really a question of what the calibration of that sanction is going to be. All right, we'll hear from you on rebuttal. On rebuttal, if you would have an appendix reference as to where a respirator was requested and rebuffed, that would be helpful. Thank you. You can leave all your things there if you'd like. Good morning. May it please the Court, Donovan Kokos on behalf of Appellees LaManna, Watson, Watkins, rather, Forsyth, Sapko, and Hausdorff. I want to make clear at the outset that all of the elements of their burden of proof were up for grabs at summary judgment. We moved for summary judgment on the ground that they couldn't demonstrate tribal issues as to either the subjective prong or the objective prong. Can you move a little closer to the microphone? Yes, I'm sorry. The objective prong of Heller, page 36 of that opinion, is defined as, they have to show a substantial risk of serious medical injury, right, harm, caused by conditions at the factory that were so dangerous we wouldn't subject anyone in society to them involuntarily. We moved on those grounds. Right. Now, answer the argument that they make, that we have to take their evidence in the light most favorable to them, right, and that they've got people saying the ventilation system didn't work, regularly didn't work, people were coming out the snowmen comment, covered in dust all the time. There was, when a respirator was asked for, there was a literal laughing at the person making the request. We hear your opponent saying, look, they knew they had a real problem. They just didn't care. Right. They literally laughed the problem off. What's the response to that? Well, my response to that is several fold. One is, you have to take each comment and each reaction to the inmate's request at the time that those requests were lodged, knowing what the institution, what the appellees knew at that time. As of 2001, there had been complaints to OSHA about dust in the air. That was it. There was no chemical complaint, just dust. OSHA came in and tested, found it safe to breathe. Microbac came in and tested, found it safe to breathe. So by after that, and up until 2003, the officials were acting based on their knowledge. I mean, if OSHA has said it's safe to breathe without a respirator, then when someone comes and asks for one, you can say you don't need a respirator. And that's not deliberate indifference. That's just accepting what OSHA has told you. And I think they have a right to do that. And their comment in response to that, of course, is they couldn't actually rely on that OSHA evidence because the defendants themselves manipulated the circumstances under which OSHA was tested. And here's my answer to that, Judge Jordan. The problem with their approach has been the whole time, and this really starts earlier than the spoliation argument, but it culminates in it, is they were claiming evidence tampering in the form of us rigging the test, not cutting as many boards, testing during months where production was lower, and then ultimately the shutdown of the factory. The problem was on their theory of the case, this is not spoliation, for example, of a document or a part of a machine or a machine that exists one minute and doesn't exist the next. The evidence they care about is this evanescent evidence, which was the air that they were breathing, which means that they needed to test that as soon as possible, and above all, when it was relevant to them, which was when they were all in the factory. That's 2003. Now, the bottom line is when they didn't do that, and then they come to the point where the factory shut down and they claim, oh, the OSHA test is invalid because you tested during all these conditions that weren't prevalent when we worked there, and now it's too late for us to test the factory. My answer to that is simple. You would ask counsel, should we assume what was in the dust? And the answer is no, you shouldn't. But you know who could assume it was their expert. Their expert could have taken the OSHA test and say, all right, they found X amount of dust on days when one board was cut when Z was the level of production. Now, toggle the assumptions. Assume everything they said can be borne out with their testimony at trial. Assume they cut three boards at a time. Assume it was during a month that was eight times as busy. Any expert worth his salt could come in and say, based on those assumptions, you can multiply what OSHA found in terms of silicon air by X amount and maybe create a triable issue as to the causation aspect of the objective plot. Doesn't your response about what the officials knew have some impact on your reliance on Wooten when it comes to saying, well, they could have walked away? I mean, if the officials couldn't be said to have understood that there was a problem, how can you analogize the circumstances to the case in Wooten where I think the court was saying people really did know what the problem was and decided to stick around, whereas here you're saying nobody really knew what the problem was. So how can they be said to have stuck around knowing they had an issue the way that here's what I thought about this a long time because I don't want to have the court create a rule that would be unfair to appellants like these guys down the line. And I think the answer is twofold. I agree with the appellants to the extent they say their knowledge of the risk when they knew it, in other words, when they read the MSDS, goes to cut off their damages. I agree with that. But remember, the objective prong of Helling twins in this tight orbit the concept of damages and causation. Now, how in the world are they supposed to show that any injury they may have suffered at that factory occurred during the period up until the time that they read the MSDS? In other words, when it was involuntary, that risk versus after they read the MSDS and continue to work there anyway. So the problem is they can't because of the fact that they stayed there voluntarily, they've actually hampered their ability really to show causation. And I think they've made it impossible to differentiate any damage they suffered involuntarily versus voluntarily. So that's my problem with that issue. I think the simplest way to resolve the appeal though, and I'm sorry I didn't see this sooner, but it's important to remember when I started at the outset, I didn't say I'm here on behalf of the United States. I'm here on behalf of these individual appellees who are being sued for only monetary damages. If you look at pages 727, 2229, 2427 of the Joint Appendix, you'll see that these guys, these appellants are suing only for monetary damages. Now, when that happens, this court said in Fauntroy versus Owens in 1998, that a helling claim, there is no cause of action under helling when appellants or plaintiffs sue only for monetary damages unless they can show present physical harm. You're no longer in risk land here. They have to show present physical harm. Now, the question then becomes, well, what would suffice? They so far have said, well, we have all these symptoms and some prison records to back them up. My answer to that is what would suffice was resolved in Monmouth County versus Lanzaro in 1987, I want to say. And there the court said, when you have an allegation of physical harm for Bivens purposes, 1983 purposes, if it's not an obvious ailment like a broken arm or something, then what you need is a diagnosis from a doctor. In point of fact, there aren't. Is it in fact the case that the district court said where your medical report? No, Your Honor, the district court at footnote eight of the R&R, the district court actually made, in my view, an incorrect decision in their favor where it said, it just cited helling like they did at page 35 of their opening brief and said, we're not going to require you to show physical harm. This is a helling claim. I think the district court lost sight of the fact that by this time, these guys were only suing for monetary damage. They wouldn't even have standing to get injunctive relief because they were out of the factory by that time. So the bottom line is without that evidence, I mean, if this case were remanded, this would have to be in a posture to go to trial. There simply isn't any evidence of physical harm. And I think we'd be entitled to a directed judgment on that aspect of the objective prong of Heller right there. Is it a genuine fact issue as to deliberate indifference? How can you argue there's no genuine fact issue when people laugh, when they wanted respirators, when there was knowledge? How can you say there's no genuine issue as to deliberate indifference? Your Honor, I would distinguish the question of indifference to request by inmates for something that they may or may not be entitled to, to the standard that the Supreme Court applies, which is it's deliberate indifference to a substantial risk of serious medical harm. To a known risk. Right. And not only does that have to be the case, but the inference has to be drawn and then disregarded anyway. That's the indifference aspect of it. Now here, I mean, I don't, not even the circumstantial evidence supports deliberate indifference because OSHA comes in in 2001, they test. We, Unicorn and Abundance of Caution, then does its Microbac tests. Those support the OSHA results. Then afterwards, to me, maybe there'd be an issue of deliberate indifference if all of a sudden the guards in the factory started wearing respirators but didn't issue them to the inmates. Instead, they walked around and despite what appellants say, some of these appellees were on the floor 40 hours a week there in a supervisory capacity. So I just don't see how there is an issue as to deliberate indifference there. Now, just to turn back a little bit to the spoliation issue, because I have to confess, I mean, having practiced bankruptcy about 10 years ago, when I saw that issue, I thought, oh, interesting. Usually I only see these. You left bankruptcy to do this? I mean, come on. I mean, it's nothing better than bankruptcy. Well, it turned out no one was going bankrupt anymore. Now it may be changed. You'd be going 24-7 today. Yeah. But when I saw this issue, I thought, well, this is very interesting. But appellants, I think, have tried to contest the standard that the district court used on appeal. But in point of fact, in the district court, they conceded that the court was applying the correct standard in applying Brewer. And they said, we think we have enough evidence of actual bad faith, fraudulent intent to The OSHA representative from D.C. got on the phone and says, yes, I made the decision. I didn't know about this lawsuit. I didn't talk to any of them. They didn't give me their input. He just made the decision on HIFR from Unicor. The bottom line is these appellees are rank and file employees of the BOP who are working at the factory. I mean, they didn't control the premises of the Unicor factory any more than I control my own office space in Pittsburgh. I mean, if GSA comes in tomorrow and says to me, we're going to turn your office into an aviary, I might love that. But I wouldn't have any control over whether it happened or not or when it happened. So not only I mean, I think those are two issues you have to keep in mind. And I think that they have some obligation to say, OK, that's fine. But, you know, we're in the midst of some litigation here, disputes about what was going on before you start moving stuff out. We better make sure that the other side has all the opportunity they want to pass. Your Honor, they had no obligation because they didn't have control of the evidence. That's from Schmidt and Brewer. And then in the Hettinger opinion, which I think was yours, Judge Rendell, the evidence at that time was no longer relevant. I mean, consider this. It sounds crazy at first because it's the air in the factory and this is what they care about. But these inmates were out of the factory and out of the institution entirely by 2004. By 2005, look what's happened. This is air they haven't been breathing for a year. Unicor has taken all the recommendations that OSHA made, even though they were not binding. And moreover, as of 2003, remember, they're complaining about Lockweld as well. Lockweld hasn't even been used since 2003. So there's no reason to think the air is going to be any worse. There's no reason to think it's going to be the same as what it was. And if anything, it's going to be better than it was at the time OSHA tested it, which all circles back to they should have got an expert who was willing to make assumptions and extrapolate based on the available evidence. They simply did not do that. And I think the last issue, it's very important to remember here, is that because there hasn't been an Eighth Amendment violation, all of these officials really should have been immune from suit. This is a case that I think got past the motion to dismiss, but a case that was colorable at a motion to dismiss phase became in many aspects, in my view, arguably frivolous at a motion for summary judgment phase because they didn't develop, and by they, I don't mean present counsel who have done a fine job on appeal, original counsel did not put this case in a posture to go to trial. They admitted they got no medical expert. And what's striking about that is they recognized in the district court that they needed to do this. They said, we have a medical expert lined up. They even made travel arrangements for the appellants to go be examined by the expert. Well, what happened was we go to move for summary judgment. By that, discovery's closed. We got no expert reports from them whatsoever. Even their industrial hygienist report, if you look at it, it's dated February 17, 2007. It's dated after we moved for summary judgment. So there's not even an expert report on causation in the record at that time. We move and they respond and introduce that report. And really, when you read that report carefully, it was just to put them in a posture to try to argue this foliation issue. My contention is that they didn't manage to create a tribal issue on that either, and I agree with the district court in ruling that way. Unless there are any further questions, I'll forfeit the remainder of my time. Thank you. There's some people in the back if you want to sit down. All right. Thank you. Judge Mandel, with respect to your question to me, I would refer you to pages 1781 through 1783 of the Joint Appendix, which is where my client Kenny Hill requests a respirator, and it's not provided. Also, with respect to the issue of objective evidence that it was a dangerous facility, I'd refer you to Joint Appendix 1370, where there's testimony that a shop foreman, Robin Bevavino, complained both about the ambient dust in the Unicorp facility and respiratory injuries that he, a non-prisoner, suffered by virtue of being on the factory floor. But did you ever get a medical expert? I mean, obviously you weren't there then, I realize. As far as the record reveals, there was no medical evidence on the plaintiff's side. But isn't that sort of a sine qua non of the claims being made? You had to show that there's some harm? At trial, certainly expert testimony would be helpful. In this case, you can look at the expert report of even defendant's medical expert, and what it reveals is that my clients have greatly compromised lung function, and the only rebuttal to that is that the expert, in his opinion, thought that they didn't put enough effort forward during the test. But again, that's rebutted by the test themselves, which says that effort was good. So in this case, although expert testimony would have to be provided, the work is done for us by defendant's expert. Bevavino, didn't Robin Bevavino surface only at the 16th motion stage? No, that's not correct, Your Honor. He's referred to throughout the deposition testimony and page 1370 is actually a deposition of defendant foresight. His own testimony was not taken in the case below, but testimony about his conditions and his complaints was. That's what I'm asking. I'm asking, was this presented to the district court? Was this argument about Bevavino presented to the district court before the 16th stage? The evidence was in the record that was present on summary judgment. On summary judgment, it was attached to the summary judgment motion, and that's page 1370 of the document. And was it argued to the district court? Not was it somewhere in the 10 volume appendix that you might have given the district court the way you gave us, but was it presented to the district court? Did the summary judgment motion discuss Bevavino at all, or did it come up for the first time on 16th? It was not argued to the district court. As you know, though, the district court is entitled to look at everything that's in the summary judgment record that's presented to them. It was there front and center, and the issue that it's relevant to, which is the conditions. Was it there front and center? Was it there front and center if nobody talked to the judge? I apologize for that characterization. It was in the papers, but it was not presented. One more thing I might mention is the causation was not briefed by the defendants in the court below. It's not here on appeal. If they had wanted to move for summary judgment in the court below, they certainly could, but causation really isn't at issue here. What about Mr. Kokos's point that if you look back at Helling, that it isn't a risk of possible future harm, it's a current harm that you can show. Is that correct? Correct. You can recover for future harm. In this case, we have a- Is he correct that what you really need to show is not a risk of future harm, but a tangible current harm? I think if you're no longer at the facility, that that's correct. You do need to show present harm, and that is what my clients have been endeavoring to do and did do in the district court, and there's ample evidence in the record to show that they were injured. Again, causation was not at issue. I see my time is up, so I thank the court. Mr. Davidson, thank you very much. Please convey to your firm, Covington & Burling, that we appreciate your taking this, and we don't want our questions to be no good deed goes unpunished. We appreciate your good deed and appreciate your willingness to take this on. Thank you very much. Well done. Yes, well done. We'll take it under advisement. The case is well argued.